**UNITED STATES of America, Appellee,**

v.

**STATE OF WEST VIRGINIA,
Appellant.**

**UNITED STATES of America,
Appellant,**

v.

**STATE OF WEST VIRGINIA, Appellee.**

Nos. 83–1485, 83–1519.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 4, 1985.

Decided June 21, 1985.

Rehearing and Rehearing In Banc
Denied July 31, 1985.

Thomas W.B. Porter, Civil Div., Dept. of Justice, Washington, D.C. (Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., David A. Faber, U.S. Atty., Charleston, W.Va., Leonard Schaitman and Tracy J. Whitaker, Civil Div., Dept. of Justice, Washington, D.C., on brief), for appellant.

J. Bradley Russell, Charleston, W.Va. (Chauncey H. Browning, Atty. Gen., Richard L. Earles, Deputy Atty. Gen., on brief), for appellee.

Before RUSSELL, PHILLIPS and SNEEDEN, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

On February 26, 1972, a coal waste dam, located on Buffalo Creek near Maris, West Virginia, was overrun by heavy rains and collapsed, releasing millions of gallons of water in a flood which caused more than 100 deaths, thousands of injuries and millions of dollars of property damages and left thousands homeless. The event is spoken of as the Buffalo Creek disaster. The Governor of the State of West Virginia immediately declared a state of emergency under the authority of Section 15–5–1, *et seq.* of the West Virginia Code (the Emer-gency Services Article). Under the State Emergency Services statute, the Office of Emergency Planning had created a state disaster emergency plan. John M. Gates was the Director of the State Office of Emergency Planning, as well as Commissioner of Finance and Administration of West Virginia. The Governor, also, promptly requested a declaration of a major disaster by the President along with federal disaster assistance under the Disaster Relief Act of 1970, 84 Stat. 1744 *repealed in part by* Disaster Relief Act of 1974, § 603, 88 Stat. 160, 164. The President responded favorably to the request and designated a "Federal Coordinating Officer" to coordinate the federal response.

Federal regulations, issued under the Disaster Relief Act, required the state and federal governments to enter into a Federal-State Disaster Assistance Agreement. 32 C.F.R. § 1710.7 (1972). That Agreement was to be executed by the Governor of the State involved in the disaster and the President's designated representative, and was to "provide for the manner in which Federal assistance is to be made available and contain the assurance of the State that a reasonable amount of the funds of the State ... will be expended in alleviating damage caused by the disaster." 32 C.F.R. § 1710.7(a). The federal regulations, issued under the Federal Disaster Relief Act in this case and made a part of the Agreement, provided for the certification by the Governor of a State officer authorized to act on behalf of the State in the execution of any necessary agreements required in carrying out the joint relief program. This State officer, as certified by the Governor in this case, was John M. Gates, the Director of the Office of Emergency Planning.

The Disaster Relief Act provided, in the case of a certified disaster, that the federal government, through the Department of Housing and Urban Development (HUD), would furnish temporary housing for the displaced families, subject to this qualification: "Any mobile home or readily fabricated dwelling shall be placed on a site *com-*

*plete with utilities provided by state or local government, or by the owner or occupant of the site who was displaced by the major disaster, without charge to the United States.*" Disaster Relief Act of 1970, § 226(a), 84 Stat. 1744, 1751, *repealed by* Disaster Relief Act of 1974, § 603, 88 Stat. 160, 184 (emphasis added).

The state of West Virginia, both by its Governor and by the Governor's designated representative, Mr. Gates, recognized its obligation as provided in section 226(a) and as provided in this regard under the Agreement between the State and federal government. Because the State was not itself in position to do the necessary preparatory work for the installation of temporary housing for the displaced victims of the disaster, it requested the federal government to perform such work. Mr. Gates, acting as the "Governor's Authorized Representative," agreed that, "[a]s this [work] is the State's responsibility, this office will be responsible for costs incurred for this assignment." The federal government, through its Corps of Engineers, did the work under this agreement.[1] The State accepted the work as properly done. The State does not question the costs of such work, as billed the State by the Corps of Engineers, which were $3,708,412.62.

As a result of a series of storms between August 17 and August 20, 1972, another disaster occurred in the Gilbert Creek area of the State of West Virginia. A similar request for federal assistance was made by the Governor of West Virginia and the request was approved by the federal government. An agreement similar to that executed in connection with the "Buffalo Creek Disaster" was executed by the state and the federal Government and a like arrangement was made for the Corps of Engineers, at the expense of the State, to do the preparatory site work for the installation of temporary housing for displaced victims of the disaster. In performing this work, the federal government incurred

costs of $633,377.41. Those costs also are not disputed by the State.

The United States demanded payment in connection with both disasters and, after delaying at the request of the State, it filed this action against the State to recover the costs, which it incurred under the State's agreement to reimburse, with interest. The District Judge bifurcated the issues of the State's liability and the United States' right to interest for the delay in payment by the State. In an excellent opinion, which canvassed thoroughly and ably both the facts and the law, the District Judge found liability under contract by the State. From that judgment entered therein the State has appealed. The District Judge, however, denied interest on the United States' claim. That decision is the subject of the United States' appeal.

■ We have no problem with the award of judgment by the District Judge in favor of the United States for the undisputed amount of its costs incurred under the contract between the State and the United States. For reasons well stated by the District Judge in his opinion herein, that contract was valid and binding upon the State. We, therefore, affirm the judgment for the principal amount of the United States' claims. We do not agree with the District Judge's denial of interest on the undisputed amount due the United States by the State. We hold that interest is to be awarded at a reasonable rate from the date the United States presented itemized bills for the disaster work done for the State at the two disaster areas.[2]

■ It is settled law, as the District Judge held, that the right to interest herein is governed by federal, not state, law. Thus, in *Royal Indemnity Co. v. United States*, 313 U.S. 289, 296, 61 S.Ct. 995, 997, 85 L.Ed. 1361 (1941), the Supreme Court said:

But the rule governing the interest to be recovered as damages for delayed

---

1. The Governor wrote the Secretary of the Army on June 9, 1972 commending the work done by the Corps of Engineers.

2. *United States v. L.N. White and Co.*, 359 F.2d 703, 714 (2nd Cir.1966).

payment of a contractual obligation to the United States is not controlled by state statutes or local common law. In the absence of an applicable federal statute, it is for the federal courts to determine, according to their own criteria, the appropriate measure of damage, expressed in terms of interest, for the nonpayment of the amount found to be due. (citations omitted)

■ Under the federal rule, interest is allowable as a matter of right for a breach of contract to pay when the amount due has been liquidated, ascertained, or agreed to.[3] We have followed this rule consistently since *Railroad Credit Corp. v. Hawkins,* 80 F.2d 818, 825–826 (4th Cir.1936):

'Compensation is a fundamental principle of damages, whether the action is in contract or in tort. *Wicker v. Hoppock,* 6 Wall. 94, 99, 18 L.Ed. 752. One who fails to perform his contract is justly bound to make good all damages that accrue naturally from the breach; and the other party is entitled to be put in as good a position pecuniarily as he would have been by performance of the contract. *Curtis v. Innerarity,* 6 How. 146, 154, 12 L.Ed. 380. One who has had the use of money owing to another justly may be required to pay interest from the time the payment should have been made. Both in law and in equity, interest is allowed on money due.' (quoting *Miller v. Robertson,* 266 U.S. 243, 257 [45 S.Ct. 73, 78, 69 L.Ed. 265] (1924)) (citation omitted).

*See also Montgomery Ward & Co. v. Collins Estate, Inc.,* 268 F.2d 830, 838–839 (4th Cir.1959); *E.I. Dupont DeNemours & Co. v. Lyles & Lang Const. Co.,* 219 F.2d 328, 341–342 (4th Cir.1955); *Chesapeake & Ohio Ry. Co. v. Elk Refining Co.,* 186 F.2d 30, 33–34 (4th Cir.1950). In applying this rule for the allowance of interest under *Royal Indemnity,* it is within the sound discretion of the District Court to fix a reasonable rate of interest to be allowed for failure to pay when due the undisputed amount. *United States v. Dollar Rent-A-Car-Systems, Inc.,* 712 F.2d 938, 941 (4th Cir.1983); *EEOC v. Liggett & Myers Inc.,* 690 F.2d 1072, 1074 (4th Cir.1982); *Ameejee Vaileejee and Sons v. M/V Victoria U.,* 661 F.2d 310, 313–314 (4th Cir.1981). In the exercise of such discretion, the court should select a rate which will fairly compensate the plaintiff for the delay in the receipt of payment. *Clarke Baridon, Inc. v. Merritt-Chapman & Scott Corp.,* 311 F.2d 389, 399 (4th Cir.1962); *Employer-Teamsters Joint Council v. Weatherall Concrete, Inc.* 468 F.Supp. 1167, 1171 (S.D. W.Va.1979).

■ In determining the right of the United States to prejudgment interest in this case the District Judge rejected the State's contention that *United States v. North Carolina,* 136 U.S. 211, 10 S.Ct. 920, 34 L.Ed. 336 (1890), forbade the award of prejudgment interest in favor of the United States. He properly found *United States v. North Carolina* inapposite in this situation. The suit for interest in that case, he observed, involved post-maturity interest on certain bonds issued by a subsidiary of the State and acquired by the United States "in the ordinary marketplace." It would have been unfair and anomalous in such a case to have allowed interest to the United States on its small ownership of bonds, acquired as we have said in an open bond market, when, under the North Carolina law, all other bond holders would have been barred from recovery of interest. That, as the District Judge perceived, was different than the case here where there was a contract executed for a valid public purpose between the two sovereigns under clear legislative authorization. He, therefore, correctly concluded that *United States v. North Carolina* did not bar the recovery of prejudgment interest in this case.

---

**3.** For a definition of a "liquidated" claim, *see Bituminous Casualty Corp. v. Lynn,* 503 F.2d 636, 646 (6th Cir.1974):

"When the amount of a claim can be ascertained readily by reference to a formula in the contract and none of the facts is in dispute or when the amount of the claim itself is not disputed, the claim is liquidated."

The District Judge held that, though *United States v. North Carolina* did not bar recovery of such interest, "time-honored principles of federalism" mandated that prejudgment interest in such a case as this will be allowed only on the basis of equitable considerations and that based on "the relative equities between the parties," he was of the opinion that "no prejudgment interest [should] be awarded in this case." The District Judge summarized the equitable considerations motivating his decision against the allowance of prejudgment interest thus: "As between the citizens of West Virginia and all the citizens of the United States, it appears more equitable to have the latter share in the defraying of the costs of the services rendered by the United States Corps of Engineers."

On appeal to this Court, the State no longer relies on *United States v. North Carolina* as barring absolutely an award of prejudgment interest here and has adopted substantially the position taken by the District Judge. Thus, in its reply brief filed here, the State set forth its position on prejudgment interest in this case as follows:

> The State, however, does not contend that it enjoys absolute immunity from prejudgment interest. It is well settled that federal courts have the jurisdiction and *power* to award money judgments against states. Thus, the State's argument is not one of a lack of federal power or jurisdiction, but rather, a discussion of existing federal policy. From what applicable federal case law and statutes there are on the subject, it clearly appears that federal courts are permitted, at least within the context of a major disaster, to exercise discretion on whether or not to award prejudgment interest against a state which has not expressly agreed to pay it. The case at bar is a perfect example of the wise use of that discretion. (emphasis in original)

While we do not agree with the District Judge that the United States was not entitled to prejudgment interest in this case as of right, we are of the opinion that, if we follow the rule enunciated by the District Judge and accepted by the State—that the allowance of such interest depends on a balancing of equities between the parties— the United States would be entitled to prejudgment interest and that it was clear error not to have allowed such interest as a part of the United States' recovery. As we have seen, the District Judge based in part his equitable conclusion upon the finding that it "appears more equitable to have [the United States] share in the defraying of the costs of the services rendered by the United States Corps of Engineers." This finding overlooks two facts that militate against the District Judge's assumption. First, the United States, in its contributions to relieving the dislocations caused by the disaster, spent, according to the record, over thirty million dollars or several times more than the State of West Virginia agreed to pay. The United States thus did share and shared in a most substantial way in relieving the distress caused by the two disasters, and there is no reason to saddle it with a greater share, especially since the other party to the contract had not, prior to this suit, made any contribution. Second, the Congress itself engaged in certain equitable balancing of the costs of disaster relief as between the federal government and the state government concerned by establishing a formula for distributing such costs between the cooperating federal and state governments under Section 226(a) of the Disaster Relief Act. When Congress has made the equitable distribution of costs, it is not within the province of the courts to establish a different formula for the distribution of costs. The State, in accepting the benefits of the Act, agreed to be solely responsible for the site preparation costs in providing temporary housing in disaster relief and it is only fair that the State should fully discharge its obligation, including the payment of interest.

It must also be noted that the State has recognized its responsibility and liability in this matter. In 1972 the Legislature of West Virginia appropriated two sums to meet the costs incident to the discharge of its responsibility. It was suggested in oral argument that the State had appropriated

the full sum due the United States under the Agreement which is the subject of this suit. In addition, the State has sued the coal company, the collapse of whose dam precipitated the Buffalo Creek disaster and compromised that case by accepting in settlement one million dollars from the coal company. Yet, the State has failed to pay the costs incurred by the United States under the agreement with the State. Presumably, the State has been earning interest on the funds appropriated for discharging this indebtedness to the United States and has reaped the benefit of its recovery from the coal company. On the other hand, the United States has been without the money due it by the State and, because of deficits in revenue over expenditures, the United States during the period of the State's delinquency has been forced to borrow at high rates of interest. If the right to prejudgment interest depends on a balancing of equities, it is manifest beyond any doubt that the equities weigh overwhelmingly in favor of the United States.

Nor can we perceive any principles of federalism which militate against the United States' right to prejudgment interest. In fact, it would seem that federalism would be thwarted by a denial of the use of the normal incidents of suit in connection with the breach of an agreement between two sovereigns, made under their proper governmental powers in effecting a public purpose on the part of each sovereign. By executing such a contract, each party implicitly consented, in event of a breach, to suit for any subsequent breach by either party to the agreement, with "the ordinary incidents of suit." [4] The maintenance of a suit for breach of such an agreement executed by the United States and a State will not work an infringement upon the sovereignty of either party. *See United States v. Texas,* 143 U.S. 621, 646, 12 S.Ct. 488, 494, 36 L.Ed. 285 (1892). Under those circumstances, where there was clear jurisdiction and implied consent to suit, it would seem elementary that a court, in adjudicating the rights of the parties, has the power to enter a decree and judgment with the usual incidents such as the recovery of prejudgment interest if allowable under the rule declared in *Railroad Credit Corp. v. Hawkins,* 80 F.2d 818 (4th Cir.1936). *See* Hart & Wechsler, *The Federal Courts and the Federal System,* 1349 (2d ed. 1973); *White v. Bloomberg,* 501 F.2d 1379, 1385–6 (4th Cir.1974). Recovery of prejudgment interest here is plainly warranted under *Railroad Credit Corp.*

It follows from what has been said that the determination by the District Court of the liability of the State for the costs incurred by the Corps of Engineers in site preparation in connection with the two disasters, as set forth the statement of such costs as furnished the State by the Corps of Engineers, is affirmed but the judgment of the District Court denying prejudgment interest from date of rendering itemized bill of costs to the State is vacated and the cause is remanded to the District Court for the award of such prejudgment interest at a rate as fixed in the sound discretion of such Court.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

**4.** *Standard Oil Co. v. United States,* 267 U.S. 76, 79, 45 S.Ct. 211, 212, 69 L.Ed. 519 (1925). *See United States v. The Thekla,* 266 U.S. 328, 339– 340, 45 S.Ct. 112, 112–113, 69 L.Ed. 313 (1924); *Bituminous Casualty Corp. v. Lynn,* 503 F.2d 636, 646 (6th Cir.1974).