COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF PUBLIC WELFARE and Cohen, Walter W., Secretary of Public Welfare

v.

UNITED STATES of America; U.S. Dept. of Agriculture and Block, John, Secretary of Agriculture.

Appeal of COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF PUBLIC WELFARE, in Nos. 85–5186/87/88/89/90/91/93/94/96/97.

Appeal of UNITED STATES of America, et al., in Nos. 85–5192/95/98, Nos. 85–5269/70/71.

Nos. 85–5186 to 85–5198 and 85–5269 to 85–5271.

United States Court of Appeals, Third Circuit.

Argued Dec. 2, 1985.

Decided Jan. 6, 1986.

Rehearing and Rehearing En Banc Denied March 21, 1986.

Before ADAMS, Acting Chief Judge, and GIBBONS and STAPLETON, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Acting Chief Judge.

The Food Stamp Program is designed to serve beneficial purposes, improving the nutrition and diet of less advantaged Americans and promoting the distribution and growth of this nation's agricultural products. 7 U.S.C. § 2011 (1982). It is financed and administered by the federal government, but participating states share considerable responsibility for managing the program.

These appeals present two important questions concerning this shared responsibility: the extent of state liability to the federal government for certain erroneous issuances of food stamp benefits, and state liability for interest on debts owed to the federal government pursuant to billings for program mistakes. We conclude that the Secretary of Agriculture, the federal official charged with administering the program, acted within his discretion in holding the Commonwealth of Pennsylvania strictly liable for the program errors at issue here. We further decide that absent specific authorization in the Food Stamp Act the Secretary may not assess interest on amounts owed by the Commonwealth for these mistakes.

As the district court reached the same conclusions, its judgment will be affirmed.

Leroy S. Zimmerman, Atty. Gen., Calvin R. Koons, Deputy Atty. Gen., Jason W. Manne (Argued), Asst. Counsel, Dept. of Public Welfare, Office of Legal Counsel, Harrisburg, Pa., for appellants.

Richard K. Willard, Acting Asst. Atty. Gen., David D. Queen, U.S. Atty., William Kanter, Freddi Lipstein (Argued), Attorneys, Appellate Staff, Civ. Div. Dept. of Justice, Washington, D.C., for appellees/cross-appellants.

## I.

Primary state responsibilities in the administration of the Food Stamp Program are to certify the eligibility of individual households and to issue food stamp coupons. 7 U.S.C. § 2020(a) (1982). These coupons are then redeemed at face value by approved retail food stores. *Id.* at § 2013(a). Pennsylvania, instead of issuing the coupons directly to recipients, distributes Authorization to Purchase (ATP) cards. Individuals take these cards to participating banks, which disburse the amount

of coupons authorized on the card. This distribution method, permitted by the federal government, is designed to enhance the security of food stamp disbursements.

The present appeals arise from the improper redemption of ATPs at various Pennsylvania banks. Although the ATP cards bear an expiration date, the name of the state of the recipient household, and other indicia of authenticity, banks occasionally issue coupons in return for expired ATPs, out-of-state ATPs, and duplicate ATPs that should never have been issued.[1] The Food and Nutrition Service (FNS) of the United States Department of Agriculture, the agency that operates the program, holds states strictly liable for the amount of such improper coupon issuances. It also charges interest on such debts beginning on the 31st day after the initial billing. Here, the FNS billed the Commonwealth approximately $565,387 plus interest pursuant to these policies.

Pennsylvania objected to the legal basis of these assessments, and appealed to the State Food Stamp Appeals Board (SFSAB), an impartial tribunal within the Department of Agriculture.[2] The board upheld FNS' imposition of liability, and refused to consider the interest issue. The state then filed actions for review de novo in the district court. That court granted summary judgment to the federal defendants on the liability issue, held that FNS could not collect prejudgment interest, and issued a permanent injunction against assessment of such interest against the Commonwealth. Both parties filed appeals.

## II.

The appeals and cross-appeals originated in five separate district court cases that were consolidated for purposes of disposition. This procedural history is further

complicated by an amended judgment issued by the district court. It is therefore necessary, as a preliminary matter, to clarify our appellate jurisdiction.

Challenged in the first suit is an FNS billing for erroneous redemptions of ATPs. Later, the state received a bill for interest due on the amount at issue in the suit and, instead of amending its complaint, it filed a second civil action to contest the interest claim. Plaintiffs' third, fourth, and fifth suits were filed after later billings, and these complaints referred to any interest that would be charged on the amounts at issue.

In its order of January 10, 1985, the district court entered summary judgment for defendants in the first case; dismissed the second case for lack of subject matter jurisdiction; and in the third, fourth and fifth actions ruled for the defendants on the liability issue, and against it on the interest issue. The Commonwealth appealed in all five cases, and the defendants cross-appealed in the latter three.

Inadvertently, the district court's January 10 order entered judgment only in the first two cases. Notified of this defect, on March 4, 1985 the district court amended its order to enter the appropriate judgments in the other three cases. Again, the parties filed five appeals and three cross-appeals relating to all cases.

The initial filings adequately conferred jurisdiction on this Court in all cases, as a notice of appeal filed after the announcement of a decision or order but before entry of the judgment is not defective as premature, but rather will be treated as filed after such entry and on the date thereof. Fed.R.App.P. 4(b). The later appeals were therefore unnecessary; accord-

---

1. The parties also referred to distributions that were erroneous for unknown reasons. We presume that this means that the amount of coupons issued by Pennsylvania banks did not comport with the amount it should have disbursed, and FNS could not assign all errors to the categories listed above.

2. SFSAB members are chosen from non-FNS employees in the Department. Board decisions are final agency actions for purposes of judicial review. 7 C.F.R. § 276.7(j) (1985).

ingly, we will dismiss the second group of appeals.[3]

Another issue emerging from this procedural thicket is the propriety of the Commonwealth's second civil action,[4] the only case to involve solely a challenge to an interest assessment. The SFSAB ruled against the Commonwealth on the underlying debt on July 6, 1983, and plaintiffs filed their first suit two days later. On July 18, they received an interest assessment, and appealed immediately to the Board. In a letter dated July 29, the Board responded: "The Food Stamp Program Regulations do not provide for an administrative review of the interest accrued on a decision rendered by the Board." On August 26, the Commonwealth filed its second suit.

■ Ostensibly, this filing fell within the 30-day deadline for seeking judicial review of adverse agency determinations. 7 U.S.C. § 2023(a)( West Supp.1985). However, the district court adopted the magistrate's conclusion that the assessment of interest follows logically from the initial billing, and the time to seek review of both began with the SFSAB's July 6 ruling. We agree with this analysis; the interest charge was not decided by the agency independently of the underlying debt, and the state had notice of FNS' intention to charge interest on all state liabilities. *See* FNS Policy Memorandum FM 82-3 (July 28, 1982). Thus, plaintiffs' second suit was untimely, and despite our ruling on the merits of the interest issue, this Court has no jurisdiction to affect the interest charged by FNS on the debt at issue in the first billing.

### III.

■ Another preliminary issue pertains to the Commonwealth's charge that improper communications between FNS officials and the SFSAB prejudiced its right to a fair hearing.

Shortly before the administrative proceedings challenged here began, the FNS administrator passed on to the Board a complaint from an FNS regional office concerning earlier decisions involving the Commonwealth. According to plaintiffs, in those decisions the Board held against the federal agency in cases similar to the present matters, but following the communication the Board reversed its position and issued the rulings on appeal here. The district court not only rejected the contention of prejudice, but also refused to allow plaintiffs to conduct extensive discovery on the matter.

Plaintiffs support their claim by citing *Ward v. Village of Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972). There, a mayor, sitting as judge, convicted the petitioner of two traffic offenses. The Supreme Court held that because the mayor, as an official responsible for revenue production, had a financial stake in the outcome, the judicial scheme abridged due process. In addition, the availability of appeal and a trial de novo in county court did not cure the unfairness; "[p]etitioner is entitled to a neutral and detached judge in the first instance." *Id.* at 61–62, 93 S.Ct. at 84.

*Ward*, however, involved a criminal proceeding. Not only is the present matter strictly administrative, but because de novo review is available the Administrative Procedure Act's (APA) restrictions on ex parte communications do not apply. 5 U.S.C. § 554(a)(1) (1982); *see also id.* at § 554(d) (rules on ex parte communications); 7 U.S.C. § 2023(a) (West Supp.1985) (providing for de novo judicial review of SFSAB decisions). Thus, even if the communications here were improper—a debatable proposition, since they did not concern a pending case—plaintiffs apparently have no legal cause to complain.

The Commonwealth claims that even if judicial precedent and the APA are not applicable, prejudice to it is real nevertheless. The SFSAB ruling is important, plaintiffs contend, because federal courts

---

**3.** The dismissed appeals are Nos. 85–5187, 85–5189, 85–5191, 85–5194, 85–5197, 85–5269, 85–5270, and 85–5271.

**4.** Civil Action No. 83–1228, Appeal No. 85–5188.

must pay it deference, and because only the Board has statutory authority to waive state liability regardless of legal basis. 7 U.S.C. § 2022(a) (1985).

Plaintiffs do not suggest, however, how this Court can dispel such "prejudice." The Board issued adverse rulings because, before the proceedings began, FNS employees communicated with it and clarified agency policy. Although the Board is styled as an impartial adjudicator, its role is to enforce the governing statute and relevant agency interpretations. We surely cannot remand to the Secretary with instructions to constitute a Board that is unaware of his policies on erroneous issuances of food stamps, and thus cure the harm plaintiffs claim they suffered. Consequently Commonwealth's contention of fatal prejudice in the SFSAB's adverse determinations must fall.

## IV.

The first substantive issue in these appeals is the extent of state liability for wrongful redemption of ATPs.

The Food Stamp Act authorizes such liability:

> Notwithstanding any other provision of this chapter, the state agency shall be strictly liable to the Secretary for any financial losses involved in the acceptance, storage and issuance of coupons.

7 U.S.C. § 2016(f) (1982). One of FNS' regulations paraphrases the statute:

> State agencies shall be responsible to FNS for any financial losses involved in the acceptance, storage and issuance of coupons.

7 C.F.R. § 276.2(a) (1985). The agency's regulations continue:

> State agencies shall be liable for the following unauthorized issuances:
> (i) The acceptance of expired ATP cards;
> (ii) The acceptance of out-of-state ATP cards;

(iii) Duplicate issuances....

7 C.F.R. § 276.2(b)(3) (1985).

The legislative intent behind the denomination of "financial loss" as the measure of state liability is nowhere made known. The parties cite no helpful materials, and our review of committee reports and floor debates reveals no legislative history concerning the phrase, either when it was added to the Act in 1977, Food Stamp Act of 1977, Pub.L. No. 95–113, Title XIII, § 7(f), 91 Stat. 968,[5] or when the standard of liability was changed from "responsibility" to "strict liability" in 1981, Food Stamp and Commodity Distribution Amendments of 1981, Pub.L. No. 97–98, Title XIII, § 1312, 95 Stat. 1285. Therefore, we must conclude that Congress meant what it said, and that a state is liable only for issuance errors that result in financial loss, either because individuals receive benefits to which they are not entitled, or because the errors necessitate additional expenditures of administrative resources. "Absent legislative history to the contrary, we must presume that the legislative purpose is expressed by the ordinary meaning of the words used, and that language must be regarded as conclusive." *Glenn Electric Co. v. Donovan,* 755 F.2d 1028, 1033 (3d Cir.1985) (per curiam); *see American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982).

In these appeals, the parties disagree whether the improper issuances resulted in financial loss. The Commonwealth insists that redemption of out-of-state ATPs results in no loss if the recipients are properly entitled to benefits. Defendants respond that one who moves to a new state is likely to show a change in financial circumstances, and for that reason they require the beneficiary to reapply and receive a new, local ATP only if he remains eligible. The parties agree that duplicate issuances result in financial loss, but plaintiffs insist

---

**5.** The term "financial losses" was in the bill, H.R. 7940, § 7(f), 95th Cong., 1st Sess. (1977), as originally introduced in the House, and was never referred to explicitly in subsequent debates. *See, e.g.,* 12 Cong.Rec. 25239 (1977) (reading of section on House floor); H.Rep. 95–464, 95th Cong., 1st Sess. 390 (1977), *reprinted in* 1977 U.S. Code Cong. & Admin. News 1978, 1704, 2319–20.

that they should first be given an opportunity to collect the overissuance in actions against the recipient before being held liable to the federal government.

The parties disagree most strongly whether bank redemption of expired ATPs results in loss. Plaintiffs maintain it does not, claiming that if those ATPs were not redeemed they would have the power to replace them if the recipient showed "good cause" for failure to timely collect his coupons. Defendants disagree, arguing convincingly that their detailed regulations permit replacement only if expired ATPs issued after the 25th day of the previous month. *See* 7 C.F.R. § 274.2(e)(3) (1985).[6] The Commonwealth responds that even if FNS is correct it is clear that no loss results from redemption of a previous month's ATPs issued after the 25th.

Both parties appear to be correct to a certain extent. Duplicate issuances result in clear loss, and the federal agency cannot be expected to wait indefinitely while the state pursues collection remedies. Further, eligibility for food stamps extends only a month at a time, 7 C.F.R. § 273.10(a), and is related to the recipient's circumstances at a particular residence. Thus, redemption of expired and out-of-state ATPs will often result in improper issuances to undeserving households. Also, all erroneous redemptions cause at least some loss by necessitating an increased administrative burden in reconciling accounts. At the same time, the Commonwealth appears correct that at times the loss that occurs from these errors is less than the value of the coupons issued, particularly where expired ATPs issued af-

ter the 25th day of the previous month are redeemed rather than replaced for households that remain eligible.

The difficult question is how the agency is required to reconcile these positions and assess the accurate amount of financial loss. The Commonwealth argues that it is entitled to a trial at which the court can measure, through statistical approximation, the true loss. FNS, in contrast, claims it may presume overissuance or at least administrative cost in every erroneous redemption, and charge the state for the value of all mistakenly issued coupons.

Our role is not to select the method we prefer, but rather to set aside the agency's choice only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." 5 U.S.C. § 706(2)(A) (1982); *see FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981). This deferential review is mandated because of Congress' "broad delegation of authority" to the Secretary to administer the Food Stamp Program. *Knebel v. Hein*, 429 U.S. 288, 293, 97 S.Ct. 549, 553, 50 L.Ed.2d 485 (1977); 7 U.S.C. § 2013(c) (1982). As Congress has not established any alternative means of assessing financial loss, we must defer to the agency's position so long as it is reasonable. *See United States v. Riverside Bayview Homes, Inc.,* —— U.S. ——, ——, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *Lugo v. Schweiker,* 776 F.2d 1143, 1147–48 (3d Cir. 1985).[7]

---

**6.** As the district court observed, "[t]o allow the states to freely accept and/or replace expired ATPs at their whim and without regard to the regulations would result in chaos in the management of a huge and complex federal program."

In support of its asserted right to redeem expired ATPs, the Commonwealth points to its obligation to restore "wrongfully denied or terminated" benefits, 7 U.S.C. § 2020(e)(II) (1982), even to households that are no longer eligible for continuing benefits. 7 C.F.R. § 273.17(a)(3) (1985). But the regulations make clear that this statute applies to state errors such as inadequate

allotments, inordinate delays in granting applications, and erroneous denials or terminations, *id.* at § 273.17(d), and not to the situation where a beneficiary receives his proper allotment but through his own error fails to collect it before the authorization expires.

**7.** Plaintiffs insist that because the SFSAB adopted its policy on financial loss for the first time in these cases, its decision is not entitled to the same measure of deference. However, an agency may change course, as long as it supplies a reasoned explanation for the shift; the same "arbitrary and capricious" standard is applied

The FNS policy is based on rational and pragmatic considerations, and must be upheld as within its discretion. It would be unduly arduous to require FNS to litigate financial loss in each case, determining, for example, which recipients who redeemed expired ATPs were still eligible at the time of redemption and which were not. Even to follow Pennsylvania's suggestion, and make such determinations only in terms of statistical approximation, would require an adjudication every time FNS bills a state for improper redemptions. In the absence of clear Congressional intent requiring or favoring such an investment of administrative resources, we will not disturb FNS' plan to avoid this result. Congress' imposition on the states of strict liability for loss resulting from errors shows its intent to place the burden for issuance errors on the party closest to and therefore in the best position to prevent such mistakes, and preserve as much resources as possible for the program's beneficial purposes. The FNS policy furthers these goals, and we are satisfied that sufficient overissuance and administrative cost results from the bank errors at issue here to justify the FNS' presumption of loss in all such cases.[8]

Plaintiffs respond that imposition of liability for the value of all errors is an unforeseen burden on participating states, and offends the rule that where "Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.... By insisting that Congress speak with a clear voice, we enable the states to exercise their choice knowingly, cognizant of the consequences of their participation." *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981).[9] But this assertion is based on the view that the FNS policy improperly expands the statutory liability. Actually, the policy is an exercise of the agency's discretion in determining how the "financial loss" is proven in individual cases. Surely states are familiar with the broad discretion Congress accords to agencies that administer and resolve the ambiguities in complex social welfare programs.

The Commonwealth also notes that the financial loss presumption is inconsistent with the position taken by the only other court to address the issue. In *Perales v. United States,* 598 F.Supp. 19 (S.D.N.Y. 1984), the court addressed a special New York City program designed to avoid

---

on review of the new action. *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 42–43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983); *State of Texas v. United States,* 756 F.2d 419, 427 (5th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 129, 88 L.Ed.2d 106 (1985).

8. *Louisiana v. Block,* 694 F.2d 430 (5th Cir.1982) (per curiam), though decided under the pre-1977 Act, is analogous. The court upheld a regulation holding states strictly liable for the value of stolen coupons, and imposed a presumption, apparently impossible to rebut, that any unrecovered stamps had been redeemed. We do not believe that Congress' mere addition of the "financial loss" measure, without any supporting legislative history, was meant to change the administrative practice. Such an irrebuttable presumption, in the social welfare context, meets constitutional due process standards so long as it is not "a patently arbitrary classification, utterly lacking in rational justification." *Weinberger v. Salfi,* 422 U.S. 749, 768, 95 S.Ct. 2457, 2468, 45 L.Ed.2d 522 (1975) (quoting *Flemming v. Nestor,* 363 U.S. 603, 611, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960)).

9. The *Louisiana* court held that the *Pennhurst* principle does not apply to federal programs imposing financial penalties on states. It believed that the principle applied in *Pennhurst* only because the lower court there had attempted to impose an *affirmative* duty on the states, not detailed in the federal statute, to provide certain rights to the mentally retarded. 694 F.2d at 431 n. 2. This interpretation reads portions of the Supreme Court's decision out of context. In *Pennhurst* the Court held first that in the statute at issue Congress had not granted rights pursuant to § 5 of the 14th Amendment, since in the past Congress had used that provision only to restrict state conduct and not to impose affirmative duties. 451 U.S. at 16–17, 101 S.Ct. at 1539–40. Only then did the Court turn to Congress' power to legislate pursuant to the spending power, and declare the principle recited above. *Id.* at 17, 101 S.Ct. at 1540. There is no logical reason why this principle should not apply to any condition on participation in federal programs.

fraud, in which ATPs are valid for eight days only and will be replaced after that time if the original was not redeemed. FNS billed the state for expired ATPs that were redeemed, but the court invalidated the charge, holding that there was no financial loss. As the opinion noted, this was a unique case; unlike ATPs that expire in 30 days, the expiration of the eight-day card did not signal an expiration of eligibility. *Id.* at 23. Still, the opinion can be read as requiring FNS to assess in each case whether financial loss has occurred, and to that extent we will not follow it. For the reasons cited earlier, we believe that Congress did not require such proceedings, and that the presumption of loss imposed by FNS to the errors at issue here is both practical and reasonable.

### V.

█ The question raised by FNS' assessment of interest on debts owed to it by states also presents a difficult task of statutory construction.

FNS claims authorization for its practice in the common law rule allowing prejudgment interest on liquidated debts. *See, e.g., United States v. West Virginia,* 764 F.2d 1028, 1031 (4th Cir.1985); *United States v. Eastern Air Lines, Inc.,* 366 F.2d 316, 321 (2d Cir.1966). "The general rule is that when the damages resulting from a breach of contract are ascertainable with mathematical precision, prejudgment interest is awardable as of right." *Eazor Express, Inc. v. International Brotherhood of Teamsters,* 520 F.2d 951, 973 (3d Cir. 1975), *cert. denied,* 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 (1976).

A similar rule applies in claims by the United States against state entities. *Board of County Commissioners v. United States,* 308 U.S. 343, 350, 60 S.Ct. 285, 288, 84 L.Ed. 313 (1939). Even where a

Congressional statute does not authorize interest, the Supreme Court has fashioned federal common law that permits its assessment in certain circumstances. *Rodgers v. United States,* 332 U.S. 371, 373, 68 S.Ct. 5, 6, 92 L.Ed. 3 (1947); *see also Clearfield Trust Co. v. United States,* 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943). Relevant considerations are the Congressional purpose behind the statute, and the relative equities. *Rodgers,* 332 U.S. at 373, 68 S.Ct. at 6. Here, these factors appear to favor FNS. The Commonwealth has had continued use of the funds, and so should normally be liable for interest on them. Further, the beneficial purposes of the Food Stamp Program dictate that all possible resources be used to serve beneficiaries.

However, plaintiffs argue that these common law principles were abolished by the Debt Collection Act of 1982. 31 U.S.C. § 3701 et seq. (West 1984), amending the Federal Claims Collection Act of 1966, formerly codified at 31 U.S.C. § 951 et seq. That statute authorizes imposition of interest by the federal government on debts owed to it, *id.* at § 3717(a)(1), but excludes states from the coverage of this provision, *id.* at § 3701(c). Consequently, the Commonwealth contends, a federal agency may not charge interest unless it finds specific statutory authorization elsewhere in the United States Code.

The exemption of states was apparently added to the bill on the Senate floor, and there is no available legislative history concerning it.[10] Thus, as noted earlier, we must adhere to the plain meaning of the statute and conclude that plaintiffs' position is correct.

Defendants note, however, that such a construction destroys the common law preference for prejudgment interest on debts owed for breach of contract, and thus

---

**10.** Senator Percy, author of the amendment, later expressed his view that the Act was intended to abrogate the common law, and leave Congress free "to legislatively pick and choose according to circumstances, those situations in which the government might assess interest against those entities exempted by the Act." Letter of November 21, 1983 from Senator Percy to the Comptroller General. Nevertheless,

such a post hoc statement of a single legislator, even of the bill's author, is not entitled to probative weight in the determination of legislative intent. *Bread Political Action Committee v. FEC,* 455 U.S. 577, 582 n. 3, 102 S.Ct. 1235, 1238 n. 3, 71 L.Ed.2d 432 (1982); *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 132, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974).

offends the principle that "a statute should not be considered in derogation of the common law unless it expressly so states or the result is imperatively required from the nature of the enactment." *Bauers v. Heisel*, 361 F.2d 581, 587 (3rd Cir.1966) (in banc), *cert. denied*, 386 U.S. 1021, 87 S.Ct. 1367, 18 L.Ed.2d 457 (1967); *see Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783, 72 S.Ct. 1011, 1014, 96 L.Ed. 1294 (1952). They insist that the Act's goal was to *mandate* interest assessments against private debtors, not to abolish interest requirements already imposed against public entities. Following this reasoning, the Comptroller General and the Attorney General, the officials responsible for enforcement of the Act, promulgated regulations allowing continued collection of interest from states as permitted by the common law. 4 C.F.R. § 102.13(i) (1985); *see also* Decision B–212222 of the Comptroller General (1982).[11]

The key flaw in this argument is the failure to recognize that the Act abrogates not state common law, but rather the federal common law allowing the federal government to charge interest to states. This is a critical distinction. Judicial deference to the common law, and the reluctance to declare its demise, is based on the federal judicial obligation to protect state sovereignty and laws absent clear declarations by Congress. *City of Milwaukee v. Illinois*, 451 U.S. 304, 312–14, 101 S.Ct. 1784, 1790–91, 68 L.Ed.2d 114 (1981). In contrast, federal courts develop their own common law only where necessary to protect

important federal interests, and only where Congress has not addressed the issue. *Id.* Where Congress has legislated, the need for this "unusual exercise of lawmaking by federal courts disappears," *id.* at 314, 101 S.Ct. at 1791, and courts must adhere to its pronouncements even where its intention to abolish the federal common law is not clear and manifest, *id.* at 317, 101 S.Ct. at 1792.

Thus, the plain meaning of the Debt Collection Act now controls the question of state liability for interest to federal agencies, and disallows such assessments in the absence of clear statutory authority. Because the Act's language is clear, we will not defer to the administrators who construe it differently. This situation contrasts with that discussed earlier concerning the liability of states for "financial loss" in disbursement errors. Congress left unstated the method of proof of such loss, and therefore delegated its determination to the agency. The Debt Collection Act, on the other hand, is comprehensive, and the administrators perceive ambiguity where it does not exist. Therefore, as the Food Stamp Act itself contains no interest provision, the Debt Collection Act bars its assessment.[12]

We join the Second Circuit, *Perales v. United States*, 751 F.2d 95 (2d Cir.1984) (per curiam), the only other appellate court to decide the issue, in holding that absent express statutory authorization federal agencies may not impose interest charges on debts owed by states.[13]

---

**11.** The Act also permits administrative offsets to collect debts, 31 U.S.C. § 3716, but exempts states from this provision as well. In *Bell v. New Jersey*, 461 U.S. 773, 103 S.Ct. 2187, 76 L.Ed.2d 312 (1983), the Court allowed such a procedure against states pursuant to the Elementary and Secondary Education Act, and defendants cite the decision as proof that the Debt Collection Act does not abolish common law remedies. However, *Bell* does not provide such support, as it found authorization for state liability in the education act itself. 461 U.S. at 782, 103 S.Ct. at 2193. *Bell* does not discuss the Debt Collection Act, nor stand for the proposition defendants assert.

**12.** Many other provisions reflect Congress' ability to impose interest on state debts in particular situations. *See, e.g.*, 42 U.S.C. § 1396b(d)(5) (1982) (Medicaid).

**13.** In *Perales*, the United States appealed only the interest issue, and not the district court's determination, discussed earlier, that waived state liability for issuance errors that did not cause financial loss. In affirming the district court's decision on the interest issue, the Second Circuit relied on the district court's reasoning. 751 F.2d at 96. The district court had denied state liability for interest pursuant not only to the Debt Collection Act, but also to the *Pennhurst* holding recited earlier, insisting that statutory impositions of requirements for state participation in federal programs be explicit. 598 F.Supp. at 24–26. Arguably, this latter reasoning provides additional support for the result reached today. In *United States v. West Virginia*, 764 F.2d 1028 (4th Cir.1985), the court upheld imposition of interest on a state debt incurred in 1972. It relied on common law principles, and inexplicably did not refer to the Debt Collection Act of 1982.

## VI.

The district court held that the Commonwealth is liable to FNS for the bank issuance errors found by the agency, but is not responsible for interest on this debt. We agree with its conclusions, and will affirm its judgment.