STATE of TEXAS and Texas Department of Human Resources, Plaintiffs–Appellants,

v.

UNITED STATES of America and U.S. Department of Agriculture, Defendants–Appellees.

No. 91–8042.

United States Court of Appeals, Fifth Circuit.

Jan. 28, 1992.

Edwin N. Horne, Will Pryor, Mary F. Keller, Asst. Attys. Gen., James C. Todd, Chief, Gen. Lit. Div., Dan Morales, Atty. Gen., Austin, Tex., for plaintiffs-appellants.

Bruce G. Forrest, William Kanter, Civ. Div., Appellate Staff, Dept. of Justice, Washington, D.C., Katherine L. Smith, Asst. U.S. Atty., Austin, Tex., Sheila Lieber, Raymond Larizza, Dept. of Justice, Civ. Div., Washington, D.C., for defendants-appellees.

Before CLARK, Chief Judge, JONES, Circuit Judge and PARKER *, District Judge.**

ROBERT M. PARKER, District Judge:

## I.

The State of Texas and the Texas Department of Human Services (Texas) appeal from the District Court's Order granting summary judgment in favor of the United States, and the U.S. Department of Agriculture (United States), and awarding prejudgment interest against Texas for the amounts due to the United States. The Court below found that the Food Stamp Appeal Board's decision holding Texas liable for mail issuance losses is not subject to judicial review. Appellant also contends

---

* District Judge of the Eastern District of Texas, sitting by designation.

** This opinion was concurred in by Chief Judge Clark prior to his resignation from the Court on January 15, 1992.

that the District Court erred in permitting the assessment of interest against the state. We affirm in part and reverse in part.

## II.

Texas incurred losses in its Food Stamp Program due to U.S. Postal Service employees stealing food stamps that had been mailed by the Texas Department of Human Services to qualified households. These losses are referred to as mail issuance losses. Texas continued to distribute Food Stamps by mail even after it became apparent that losses were unacceptably high, for the purpose of assisting an investigation into the thefts and the prosecution of the thieves. Food Stamp Policy Memo, Index No. 85.04 addresses the question "Can a state agency be relieved from liability for mail issuance losses that occur during the course of a Postal Service investigation? The answer given by the Policy Memo is:

"For normal or routine Postal Service investigation of mail theft, State agencies will not be relieved from liability for mail issuance losses ... However, in extraordinary circumstances where the success of a Postal Service's investigation into heavy food stamp mail issuance losses is contingent upon the State's cooperation by continuing its mail issuance system, requests for relief from liability will be considered on a case by case basis by the FNS Regional Administrator. To be considered, the state must present a convincing argument that it is only continuing with mail issuance in the affected area to cooperate with the Postal Service investigation, and it must make its request in advance of the conduct of the investigation."

Texas did not request a waiver of strict liability prior to the investigation as required in Policy Memo No. 85–04. In fact Texas claims the Department of Human Resources had no record of receiving a copy of the Policy Memo, nor did any Texas official have knowledge of the memo or its criteria for requesting a waiver prior to the investigation in this case. The Policy Memo was issued on November 30, 1984, and properly indexed in 1985, thus giving Texas official notice of its existence and contents.

Texas was notified by the United States that she would be liable for $150,350.00 for mail issuance losses incurred during April—September 1986 and for $262,035.00 for mail issuance losses incurred during October 1986—March 1987. Texas was advised that interest would accrue beginning thirty (30) days after notice.

Texas sought waivers of liability for mail issuance losses in hearings before the Food Stamp Board on each case. The Board determined that tolerance levels were exceeded and affirmed Texas' liability in both cases. The letter notifying Texas of the Food Stamp Board's decision commended Texas for its efforts to cooperate with the U.S. Postal Service in an attempt to curb the thefts. However, the board declined to waive Texas' liability, stating that the efforts were no greater than was to be expected. Texas then filed suit in district court for a *de novo* review of the Board's action.

## III.

The Congress established the Food Stamp Program to improve the nutritional well-being of low income individuals who would have difficulty purchasing a nutritious diet. 7 U.S.C. § 2011 et seq. The Texas Food Stamp Program is administered jointly by the federal government and the Texas Department of Human Services. Eligibility and benefit standards for participation in the program are set by the Food and Nutrition Service (FNS) of the United States Department of Agriculture, 7 U.S.C. § 2014(b). The Secretary of Agriculture is authorized to issue such regulations as he deems necessary or appropriate for the efficient administration of the Food Stamp Program. 7 U.S.C. § 2013(c). The cost of the food stamps is borne entirely by the United States. The cost incurred by the participating state in the administration of the program is divided between the state and federal governments. 7 U.S.C. § 2025(a). The actual, day-to-day operation of the Texas program is carried out by the

Texas Department of Human Services (TDHS). TDHS has authority to deliver the coupons to eligible individuals by mail or over-the-counter. Mail issuance is cheaper, administratively easier and preferred by many recipients who are housebound or without transportation. When Food Stamps are placed in the mail and not received, they must be replaced. If the original coupons and their replacements are both redeemed, the cost to the federal government doubles for that issuance. In 1981, Congress added a section to the Food Stamp Program providing that the States would be liable for mail issuance losses "to the extent prescribed in the regulations promulgated by the Secretary." 7 U.S.C. § 2016(f). The FNS adopted regulations establishing a tolerance level of .05% above which the participating state is held strictly liable for mail issuance losses. Losses up to .05% are absorbed by the U.S. regardless of fault. 47 Fed.Reg. 50682, 7 CFR 274.3.

The Secretary has discretion to waive a valid claim, if to do so would serve the purpose of the statute. 7 U.S.C. § 2022(a)(1). The Food Stamp Policy Memo, Index No. 85.04 describes extraordinary circumstances where relief from liability for mail issuance losses may be considered. The Board determined in this case that a waiver of Texas' liability, requiring the federal government to bear the entire loss would be contrary to the intent and purpose of the regulations. The letter from the Chairman of the Food Stamp Appeals Board advising Texas of the Board's decision concluded with the following language:

> "Should the State of Texas be aggrieved by this final determination, it may seek judicial review and trial *de novo* by filing a complaint against the United States ..."

### IV.

Texas sought judicial review. The District Court granted the Motion for Summary Judgment filed by the United States Department of Agriculture holding that Congress bestowed upon the Secretary of the Department of Agriculture complete discretion in the decision to forego an otherwise valid claim against the state. Therefore, the Department's decision regarding the appropriateness of waiver in a particular case is not subject to judicial review. Texas brings her first point of error challenging the appropriateness of the summary judgment order. Texas alleges that there was evidence before the court below raising a genuine issue of fact as to whether or not the Food Stamp Appeals Board recognized their authority under the law to waive strict liability under these facts. The United States answers that, first, the Board's decision is committed to agency discretion by law, and no exploration of the Board's reasoning is allowed. Second, the Board *did* consider the State's waiver application and declined to grant the waiver. Third, the State never asked the Board to consider Policy Memo 85–04, and so cannot now complain that the Board did not expressly consider it. Finally, the application of Policy Memo 85–04 to the facts as recited by Texas would have made no difference to the outcome of the proceeding. We agree.

■ The Secretary of the Department of Agriculture is authorized to issue such regulations "as he deems necessary or appropriate for the efficient administration of the Food Stamp Program." 7 U.S.C. § 2013(c). The strict liability scheme was a valid exercise of statutory authority under 7 U.S.C. § 2016(f). The Department has authority to waive claims pursuant to 7 U.S.C. § 2022(a)(1) if the Secretary determines that to do so would serve the purposes of this chapter.

■ An agency decision not to take enforcement action is presumed to be unreviewable in the courts unless Congress imposes explicit restrictions on the scope of agency enforcement discretion, and provides judicially manageable standards for determining when the agency has violated those restrictions. *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). Congress did not impose any restriction on the scope of agency discretion to grant waivers. There are thus no judicially manageable standards arising from

the statute under which the Court can evaluate this case, because it involves an area in which Congress empowered the agency with discretion to waive the charges it determines appropriate. The department's ultimate decision regarding appropriateness of a waiver in this particular case is not subject to judicial review. Texas argues, however, that Food Stamp Policy Memo, Index No. 85.04, created judicially manageable standards for determining if the agency abused its discretion. Even if this were true, we would not hold that the Food Stamp Appeals Board abused its discretion in failing to grant Texas relief under the Policy Memo. Texas was on constructive notice of the Policy Memo. Not only did the state not comply with that memo, but she failed to raise the applicability of the Policy Memo before the Food Stamp Appeals Board. We therefore affirm the trial court's order granting summary judgment in this respect. We further find it unnecessary to undertake an analysis of whether or not the decision was arbitrary and capricious or an abuse of discretion.

## V.

■ The Appellant next challenges the right of the Federal government to collect prejudgment interest on amounts owed by the state as a result of mail issuance losses in the Food Stamp Program. One circuit has allowed interest in this situation, *Gallegos v. Lyng*, 891 F.2d 788 (10th Cir.1989), while three other circuits have considered the issue and ruled that interest is not allowable. *Perales v. United States*, 751 F.2d 95 (2d Cir.1984) (per curiam), *affirming*, 598 F.Supp. 19 (S.D.N.Y.1984); *Pennsylvania Dep't of Public Welfare v. United States*, 781 F.2d 334 (3rd Cir.1986); *Arkansas by Scott v. Block*, 825 F.2d 1254 (8th Cir.1987). The Fifth Circuit has not addressed the issue.

At the heart of the controversy lies the interpretation of the Debt Collection Act of 1982, 31 U.S.C. § 3701, et seq. The act provides for interest against "persons" who owe past due debts to the United States. Section 3701 excludes from the definition of "persons" any agency of a state government. The exclusion under § 3701 does not prohibit interest assessments against state agencies in all circumstances. Congress is free to impose interest obligations by specific statutory authorization, as it has done in the Medicaid Act, 42 U.S.C. § 1396b(d)(5), and the Social Security Act, 42 U.S.C. § 418(j). However, the Food Stamp Act was silent on the issue of interest at the time the District Court entered its judgment. Congress has since amended 7 U.S.C. § 2022 adding that the State agency shall be liable for interest on any unpaid portion of a claim, and setting out the rate of interest and the time when it will begin to accrue. This amendment became effective on November 28, 1990, Pub.L. 101–624, § 1781(b)(2), fifteen days after judgment was entered in this cause, and therefore does not provide authority for the court's order in this cause. Neither party took the position before the District Court or this Court that the current interest provision in 7 U.S.C. § 2022 affects the outcome of this case.

Prior to the enactment of the Debt Collection Act of 1982, the courts had developed a body of common law to control when interest would be imposed. In the absence of an unequivocal prohibition of interest on statutory obligations, the Supreme Court fashioned rules which granted or denied interest by appraising the congressional purpose in imposing the specific obligation in light of "general principals deemed relevant by the Court." *Rodgers v. United States*, 332 U.S. 371, 68 S.Ct. 5, 92 L.Ed. 3 (1947). The District Court, relying on *Gallegos, supra*, found that the Debt Collection Act does not abrogate the federal government's common law right to assess interest on amounts owed by a state in this context. We disagree.

■ The language exempting state agencies from the Debt Collection Act was added to the bill on the Senate floor, and there is no available legislative history concerning it. Senator Percy, the author of the amendment, in a letter to the Comptroller General expressed his view that the Act was intended to abrogate the common law,

and leave Congress free "to legislatively pick and choose according to circumstances, those situations in which the government might assess interest against those entities exempted by the Act." See *Pennsylvania Dep't of Public Welfare v. United States*, 781 F.2d 334, 341, n. 10 (3rd Cir.1986). An after the fact statement of a single legislator, even the amendment's author, is not entitled to probative weight in the determination of legislative intent. *Bread Political Action Committee v. Federal Election Com.*, 455 U.S. 577, 102 S.Ct. 1235, 71 L.Ed.2d 432 (1982); *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). However, the interpretation articulated by Senator Percy is the only viable interpretation of the Debt Collection Act possible under the plain meaning of the statute.

The Appellees, like the Court below, rely on the reasoning expressed in *Gallegos v. Lyng*, 891 F.2d 788 (10th Cir.1989) to support their claim for interest.

First, the Eighth Circuit in *Gallegos, supra*, discusses the significance of *West Virginia v. United States*, 479 U.S. 305, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987). The sole issue in *West Virginia* was whether the state was liable for prejudgment interest on a debt arising from a contract between the state and federal governments. The Court noted that the Debt Collection Act of 1982 was inapplicable because the claim arose under a contract entered into before October 25, 1982. The Court stated, "Moreover, we venture no opinion regarding the question whether this enactment [the Debt Collection Act of 1982] was intended to abrogate or leave intact the federal common law governing when a State must pay interest to the Federal Government." 479 U.S. at 312 n. 6, 107 S.Ct. at 707 n. 6, 93 L.Ed.2d 639. The *Gallegos* opinion notes that "while the Supreme Court expressly reserved the issue, its reference ... to the relationship between the Debt Collection Act and the federal common-law right to collect interest at least suggests that the statute is not as ambiguous as appellant would have us find." 891 F.2d at 797. We decline to read anything into the *West Virginia, supra* opinion con-

cerning the matter before this Court. That case simply reaffirmed the right of the Federal Government to prejudgment interest where the underlying claim is a contractual obligation entered into before the effective date of the act. The factual differences between that case and this one and the Court's express reservation of the issue before us precludes any reliance on the Supreme Court's ruling.

Second, the Eighth Circuit concluded, as we have, that there is no discernible legislative history to guide us with this question.

Third, having decided that the plain language of the statute and the lack of legislative history did not answer the question before them, the Court in *Gallegos* explored the purpose of the act itself. It discerned that the act was intended to tighten the collection process and create incentives for the timely payment of debts to the United States. It then concluded that to hold Congress to the literal meaning of their words and exempt state agencies from the payment of interest absent specific statutory authority to the contrary would create the absurd result of creating incentives for the nonpayment of state debts. We have no quibble with that statement of the purpose of the act. However, we do not agree that the states will have an incentive to shirk their debts incurred under the Food Stamp Act if no interest is allowed. The Food Stamp Act is a comprehensive legislative scheme for dividing financial responsibility for nutritional support for poor people between the States and the Federal Government. Under the Food Stamp Act state agencies are liable to pay the actual losses created by coupon shortages and unauthorized issuances. Unpaid claims for these losses can be recovered through offsets against the federal share of administrative funds to which the state agency is otherwise entitled. 7 U.S.C. §§ 2016(f) and 2022(a) and 7 C.F.R. 276. *Perales v. United States*, 598 F.Supp. 19 (S.D.N.Y.1984). The Congress was in the best position to decide the appropriate incentives or penalties to include in the Food Stamp Act. Congress elected not to include prejudgment interest in the initial statutory scheme. The Court cannot alter

that decision. The 1990 amendment to the Food Stamp Act reaffirms our position that Congress does provide specific interest provisions where they are appropriate.

Fourth, the *Gallegos* opinion cites the principal that implied repeals of the common law are disfavored and should be found only where such a statutory purpose is evident, citing *St. Regis Paper Co. v. United States*, 368 U.S. 208, 82 S.Ct. 289, 7 L.Ed.2d 240 (1961), and *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 72 S.Ct. 1011, 96 L.Ed. 1294 (1952). *Gallegos* characterizes their ruling allowing interest as an example of filling a gap left by Congress' silence in the Debt Collection Act of 1982. The Debt Collection Act is not silent concerning whether or not state obligations should be subject to prejudgment interest. The Act specifically excludes states from the payment of interest under the act. In § 3717(g)(1) the Act further specifies that the Act will not apply "if a statute, regulation required by statute, loan agreement or contract prohibits charging interest or assessing charges or explicitly fixes the interest or charges," thus allowing Congress to legislatively pick and choose where the imposition of interest is necessary. Having chosen clearly in the Food Stamp Act *not* to impose interest during the time period relevant in this case, the Courts are not free to "supplement" Congress' enactment. *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978).

In further support of their conclusion, the Eighth Circuit noted that the General Accounting Office and the Comptroller General agreed with their construction of the statute, stating, "There is no evidence of congressional intent to prohibit ... the assessment of interest and other charges against State and local governments when an agency of the Federal Government is acting pursuant to some other authority which may be available to it, whether founded in statute or common law." Decision of the Comptroller General (Aug. 23, 1983) at 2. We disagree with this interpretation of the statute and find neither persuasive reasoning nor precedent in the statement.

A final argument is addressed in the *Gallegos* opinion: whether interest improperly extends the terms and conditions under which the state had agreed to participate in the food stamp program in contravention of *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). *Pennhurst* held that legislation enacted pursuant to the spending power is much in the nature of a contract. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously. By insisting that Congress speak with a clear voice, we enable the states to exercise their choice knowingly, cognizant of the consequences of their participation. *West Virginia v. United States*, 479 U.S. 305, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987) held that in the case of a contract between the state and the federal government, the federal courts are to determine the measure of damage, expressed in terms of interest, for nonpayment of the amount found to be due, *in the absence of an applicable federal statute*. Interest is an element of complete compensation. The purpose of interest is to make the injured creditor whole for the lost use of the money. Therefore, the Eighth Circuit found that *Pennhurst* did not bar the federal government's claim to prejudgment interest. The case before us, unlike *West Virginia, supra* involves an applicable federal statute. Therefore, this final argument also fails.

For these reasons, we hold that the Debt Collection Act of 1982 abrogated the federal common-law right to assess interest on outstanding debts of the states incurred under the mail issuance loss provision of the Food Stamp Act, prior to the November 28, 1990, amendment to the Act.

VI.

The District Court's order granting the United States' Motion for Summary Judgment is AFFIRMED.

The District Court's order that Texas pay prejudgment interest on the amount owed to the United States is REVERSED.