Lou GALLEGOS, Secretary, New Mexico Human Services Department, Plaintiff–Appellant, Cross–Appellee,

v.

Richard LYNG, Secretary–Designate of the United States Department of Agriculture, Defendant–Appellee, Cross–Appellant.

Nos. 88–1367, 88–1370.

United States Court of Appeals, Tenth Circuit.

Dec. 15, 1989.

Submitted on the Briefs: *

Jennifer A. Salisbury, Gen. Counsel, and Dale S. Morritz, Asst. Gen. Counsel, New Mexico Human Services Dept., Santa Fe, N.M., on the briefs, for plaintiff-appellant, cross-appellee.

John R. Bolton, Asst. Atty. Gen., John Koch, Office of Gen. Counsel, Dept. of Agriculture, Washington, D.C.; William L. Lutz, U.S. Atty., Albuquerque, New Mexico; William Kanter and Bruce G. Forrest, Dept. of Justice, Washington, D.C., on the briefs, for defendant-appellee, cross-appellant.

Before MOORE, ANDERSON and BRORBY, Circuit Judges.

BRORBY, Circuit Judge.

This is an appeal and cross-appeal from an order granting summary judgment of the United States District Court for the District of New Mexico. Appellant/Cross–Appellee, Lou Gallegos, Secretary of the New Mexico Human Services Department and Plaintiff below, appeals the district court's ruling that the Department of Agriculture's food stamp mail loss tolerance regulation, 7 C.F.R. § 274.3(c)(4), is not arbitrary and capricious and was promulgated in accordance with law. Appellee/Cross–Appellant, Richard Lyng, Secretary of the United States Department of Agriculture and Defendant below, appeals the court's order prohibiting him from charging the State of New Mexico interest on the unpaid amounts assessed under the regulation. This court agrees that the contested regulation is not arbitrary and capricious and was promulgated lawfully, but reverses on the interest issue.

The food stamp program is a federal-state cooperative endeavor established by 7 U.S.C. §§ 2011–2030 (1988). Section 2013(c) authorizes the Secretary of Agriculture to issue such regulations "as he deems necessary or appropriate for the efficient administration" of the food stamp program. Food stamp regulations must be promulgated according to the notice and comment requirements of the Administrative Procedure Act. 5 U.S.C. § 553 (1988). The Food and Nutrition Service (FNS) of the Department of Agriculture sets eligibility and benefits standards for participation in the program. 7 U.S.C. § 2014(b). Under FNS regulations, participating states can choose among several delivery systems, including mail delivery, for distributing coupons to recipients.

Under prior rules, FNS assumed full financial liability for replacing coupons lost in the mail. Current regulations, however, establish essentially a cost-sharing approach, under which participating states are liable to FNS for coupons lost in the mails in excess of certain tolerance levels. *See* 7 C.F.R. § 274.3 (1988). FNS established the tolerance levels after studying mail loss data for the years 1979–81. The thresholds were established "to give State

---

* After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9. The cause is therefore ordered submitted without oral argument.

agencies a significant and realistic incentive to reduce [mail] losses." 47 Fed.Reg. 50,682 (1982). FNS received several comments on the proposed regulations urging that the states should not be liable for mail losses "directly related to Postal Service operations." 48 Fed.Reg. 15,223, 15,225 (1983). The final rule rejected that proposal, but FNS stated in its preamble to the final regulations that the issue would be reexamined in the future "to determine if regulatory changes are needed." *Id.* at 15,225. FNS also rejected a suggestion that mail losses be reported on a statewide basis. FNS favored reporting on the basis of smaller units because that would serve better to identify the source of the mail losses. *See* 48 Fed.Reg. at 15,224. The current regulation provides that FNS will work with the state agency to identify an appropriate subdivision below the state level for reporting purposes. FNS "reserves the right to make the final determination on reporting requirements and on administrative divisions within the state for the purpose of determining and assessing liability for mail issuance losses." 7 C.F.R. § 274.3(c)(4)(v).

The State of New Mexico has incurred mail losses that exceed the tolerance level. Brief of Appellee/Cross–Appellant at 7 and n. 6. The state Human Services Department brought this suit for declaratory and injunctive relief challenging the FNS regulation as arbitrary and capricious, alleging that the regulatory scheme is counter to the governing statute. The State contends the regulation improperly attempts to shift food stamp costs from the federal government to the states and to impose liability on the states even though no loss to the federal government has occurred and in spite of the lack of any fault of the states. New Mexico also charges that the regulation was promulgated unlawfully in that FNS

failed adequately to consider important aspects of the mail loss problem.

The trial court, in a judgment issued without opinion on motions for summary judgment filed by both parties, rejected New Mexico's challenges to the rule but ordered that the Secretary of Agriculture could not collect interest from the State on the sums it owed FNS for excess mail losses.

The parties agree that there are no "genuine issue[s] of material fact"; thus, in reviewing the grant of summary judgment, this court must determine "whether the substantive law was correctly applied.... [W]e may affirm the granting of summary judgment if any proper ground exists to support the district court's ruling." *Hokansen v. United States*, 868 F.2d 372, 374 (10th Cir.1989) (quoting *Setliff v. Memorial Hosp. of Sheridan County*, 850 F.2d 1384, 1391–92 (10th Cir.1988)).[1] Although this court reviews *de novo* the district court's legal determinations, our review of FNS's administrative action is rather narrowly confined by the Administrative Procedure Act, 5 U.S.C. § 553. The "arbitrary and capricious" standard of review is a narrow one, which does not allow the court to substitute its judgment for the agency's. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *New Mexico Envtl. Improvement Div. v. Thomas*, 789 F.2d 825, 831 (10th Cir.1986). We must affirm the agency's action if there is a rational basis for its decision. *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 290, 95 S.Ct. 438, 444, 42 L.Ed.2d 447 (1974). "Where the empowering provision of a statute states simply that the agency may 'make ... such rules and regulations as may be necessary to carry out the provisions of this act,' ... the validity of a regulation promulgated thereunder will be sustained so long as it is

---

1. Appellant New Mexico contends that, since it opposed FNS's motion for summary judgment, the "record must be viewed in the light most favorable to appellant/cross-appellee, HSD." Brief of Appellant at 4. New Mexico, however, misstates the governing law. "In determining whether a genuine issue of material fact exists, we undoubtedly must view the evidence in a

light most favorable to the party opposing the motion." *Missouri Pac. R.R. v. Kansas Gas & Elec. Co.*, 862 F.2d 796, 798 (10th Cir.1988). Here, however, as New Mexico concedes, there were no genuine issues of material fact. *See* Brief of Appellant at 4. Because a ruling on the motion involves purely legal determinations, our review is *de novo. See id.*

'reasonably related to the purposes of the enabling legislation.'" *Mourning v. Family Publications Serv., Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973) (footnote and citations omitted).

### I. Mail Loss Regulation Is Not Arbitrary and Capricious

■ The State of New Mexico contends that FNS's food stamp mail loss regulation is arbitrary and capricious because it contravenes congressional intent in the Food Stamp Act that the federal government be responsible for the cost of the food stamps themselves, while the states and federal government share the administrative costs of running the program. New Mexico contends that the mail issuance liability program is not designed to achieve the most effective distribution method but rather is merely an attempt by the federal government to shift the cost of benefits to the states. The State concedes that the regulations may be "technically consistent with § 2016(f) of the Food Stamp Act," [2] but it nevertheless contends that the rule is inconsistent with the overall scheme of the Food Stamp Act, i.e., that "the federal government pay for the *benefits themselves,* while the states ... pay for a *portion of the administrative costs.*" Brief of Appellant at 6 (quoting *Stewart v. Butz,* 356 F.Supp. 1345, 1350 (W.D.Ky.1973), *aff'd,* 491 F.2d 165 (6th Cir.1974) (emphasis in original)). Essentially, New Mexico argues that, if only the replacement stamps, not the original stamps lost in the mail, are redeemed, the federal government has incurred no financial loss in providing a second set of stamps to the recipient. Therefore, in holding the state liable for the mail loss, the federal government is improperly shifting liability for the cost of the benefit to the state.

New Mexico further contends that the regulations are arbitrary and capricious because they impose strict liability on the states for mail losses, while § 2016(f) of the Food Stamp Act excludes mail issuance losses from those financial losses for which the states are held strictly liable. The full text of 7 U.S.C. § 2016(f) provides:

Notwithstanding any other provision of this chapter, the State agency shall be strictly liable to the Secretary for any financial losses involved in the acceptance, storage and issuance of coupons, including any losses involving failure of a coupon issuer to comply with the requirements specified in section 2020(e)(20) of this title, *except that* in the case of losses resulting from the issuance and replacement of authorizations for coupons and allotments which are sent through the mail, the State agency shall be liable to the Secretary to the extent prescribed in the regulations promulgated by the Secretary.

(Emphasis added.) The State argues that the language of the statute makes it clear that Congress considered but rejected the possibility of strict liability for mail issuance losses and directed that the Secretary of Agriculture promulgate rules imposing something less than strict liability for this category of losses. The balance of New Mexico's argument is devoted to a discussion of the unfairness of holding states liable regardless of fault and of imposing penalties for mail losses even when mail issuance remains the most cost effective method of disbursing food stamps.

New Mexico's assertion that the mail issuance loss regulation is inconsistent with the statutory scheme cannot stand in the face of the clear language of § 2016(f). That statute, under which 7 C.F.R. § 274.3 was promulgated, is an express exception to the former rule that the federal government would absorb the entire cost of food stamps. As the statute states, "the State agency *shall be liable* to the Secretary to the extent prescribed in the regulations promulgated by the Secretary" for food stamps lost in the mail. In addition, the

---

2. 7 U.S.C. § 2016(f) provides:

Notwithstanding any other provision of this chapter, ... in the case of losses resulting from the issuance and replacement of authorizations for coupons and allotments which are sent through the mail, the State agency shall be liable to the Secretary to the extent prescribed in the regulations promulgated by the Secretary."

introductory phrase "notwithstanding any other provision of this chapter" reveals that benefit costs are treated differently in § 2016(f) than under the rest of the food stamp program. New Mexico claims that the "except that" proviso in the statute shows that strict liability is not to apply to mail issuance losses, but this claim also fails under more careful scrutiny. The statute does not prohibit strict liability for mail issuance losses but rather provides that liability for such losses will be determined by the Secretary pursuant to his rulemaking authority. Moreover, the liability that has been imposed by the Secretary is strict only in the sense that it is imposed without fault. The states do not bear the sole liability for mail issuance losses as they do for other "financial losses involved in the acceptance, storage, and issuance of coupons" under § 2016(f). Instead, the regulation at issue here apportions liability for coupons lost in the mail between the federal government and the states. Basically, the federal government is liable for all losses up to 0.5 percent of the dollar value of the coupons issued by mail by each reporting unit. States are liable only for losses in excess of the 0.5 percent threshold. 7 C.F.R. § 274.3(c)(4).

The threshold was established by FNS after determining mail loss issuance rates over a three-year period prior to promulgating the regulation. FNS considered 0.5 percent a realistic goal and believed it would encourage states to identify areas where they were having mail loss problems and improve their efficiency in those areas. Brief of Appellee/Cross–Appellant at 5–6. Given that the Food Stamp Act authorizes the Secretary to issue "such regulations ... as [he] deems necessary or appropriate for the effective and efficient administration of the food stamp program," 7 U.S.C. § 2013(c), the mail loss regulation needs only to meet the reasonable relationship test set forth in *Thorpe v. Housing Auth. of Durham*, 393 U.S. 268, 280–81, 89 S.Ct. 518, 525–26, 21 L.Ed.2d 474 (1969), and *Mourning v. Family Publications Serv., Inc.*, 411 U.S. at 369, 93 S.Ct. at 1660, to be valid. The regulation clearly meets this deferential test.

It is not necessary that the federal government prove that food stamps reported as lost have been redeemed before holding the states liable for the value of those lost coupons. Food stamps are highly negotiable, and the regulatory presumption that they eventually will be redeemed is reasonable. This presumption was sustained in *State ex rel. Health & Human Servs. v. Bergland*, 531 F.Supp. 118 (M.D. La.), *aff'd*, 694 F.2d 430 (5th Cir.1982). As the district court in that case noted: "The presumption of redemption of stolen coupons eliminates the cost and effort that would be required to establish whether any particular stolen coupon was in fact presented for redemption...." 531 F.Supp. at 121. FNS argues and we agree it would have been irrational for the Department of Agriculture to adopt a tracking system for food stamp issuances and redemptions as the State of New Mexico suggests. Such a system likely would cost more than the savings expected from the mail loss reduction program; thus it was not arbitrary or capricious for FNS to reject this proposal. *See Phillips Petroleum Co. v. Environmental Protection Agency*, 803 F.2d 545, 562 (10th Cir.1986) (quoting *Bowles v. Willingham*, 321 U.S. 503, 517, 64 S.Ct. 641, 648, 88 L.Ed. 892 (1944) ("considerations of feasibility and practicality are certainly germane" to the issue of an agency's exercise of rulemaking discretion)).

Similarly, a liability system based on fault would impose an overwhelming administrative burden on both FNS and the states and would be prohibitively costly. Furthermore, there clearly is no requirement in the statute that liability for mail issuance losses be contingent upon fault. Indeed, under the plain terms of § 2016(f), the Secretary could have required the states to bear the full cost of replacing food stamps lost in the mails, regardless of any fault on their part. Under the regulation adopted, however, the federal government bears the bulk of the liability for such losses. The rule encourages states to use the cost-effective method of mail issuance, while at the same time encouraging them

to reduce mail losses and improve their efficiency by making them liable for all excess losses. Brief of Appellee/Cross–Appellant at 5–6, 22; 48 Fed. Reg. 15,223. The regulation is clearly consistent with the statute and reasonably related to its purposes.

New Mexico also argues that FNS has been arbitrary and capricious in its application of the regulation. While New Mexico treats this as a separate issue and devotes considerable attention to it in its brief, we address it here because it implicates the same issues of fairness and FNS's authority to allocate liability raised in the foregoing discussion. New Mexico does not challenge FNS's authority to require reporting of mail issuance losses on a substate level, but contends that FNS's requiring New Mexico to report on a countywide basis, while allowing ten other states to report on the basis of some other, larger subdivision, is unfair and hence arbitrary and capricious. Assuming without deciding that New Mexico has standing to raise this issue,[3] it is nevertheless not clear whether FNS has had a proper opportunity as the responsible administrative agency to resolve this issue. FNS contends that New Mexico has not exhausted its available administrative remedies because it has not requested FNS to approve a different reporting system "in the manner prescribed by 7 C.F.R. 274.3(c)(4)." Brief of Appellee at 32–33. We do not find that the cited regulation "prescribes" any particular "manner" for requesting such changes. However, it is apparent from the record that New Mexico's attempts to obtain approval for different reporting units have consisted only of oral requests of FNS, and FNS's negative responses have issued from individual officials of unknown rank or authority.

Furthermore, New Mexico's argument on this issue appears to be based substantially upon information derived from the trial

court discovery process. It does not appear that New Mexico has presented this information to FNS in the course of requesting approval of a different reporting system. The regulation provides that "the State agency shall work in consultation with FNS to identify a particular administrative division below that of the State agency that will permit reporting and computation of mail issuance losses and liability assessment." 7 C.F.R. § 274.3(c)(4)(v). This court cannot review FNS's "decision" in this matter without a record of the consultation process required by the regulation. The agency's action must be reviewed on the basis articulated by the agency and on the evidence before the agency at the time it acted. *American Mining Congress v. Thomas,* 772 F.2d 617, 626 (10th Cir.1985). Thus, this claim of New Mexico is not properly before us.

## II. The Mail Issuance Loss Regulation Was Properly Promulgated

■ New Mexico contends that the mail issuance loss regulation is invalid because FNS failed adequately to consider comments received during the rulemaking process on Post Office responsibility for mail losses of food stamps. Several of the fifty-five comments FNS received on its proposed rule suggested that states be excused from mail loss liability when the losses could be traced to postal service operations. *See* 48 Fed.Reg. at 15,223. FNS nevertheless decided to retain the proposed allocation system for federal and state liability for mail losses, but in its preamble to the final rule it stated that it would "carefully examine postal service responsibilities in this regard and reexamine this issue ... to determine if regulatory changes are needed." *Id.* at 15,225. New Mexico contends that FNS, by these actions, recognized that its proposed regulation was flawed and that it had insufficiently considered an important aspect of the mail loss

**3.** *See Arkansas v. Block,* 825 F.2d 1254, 1257 n. 4 (8th Cir.1987). Appellant relies on *Arkansas v. Block* for its argument that it has been injured and thus has standing to raise this issue. It claims that, had it been allowed to report mail loss data on a statewide basis or to combine

certain high-loss and low-loss counties, it would have paid no sanctions since the inception of the mail loss liability system. Thus it argues it has been injured by FNS's application of the contested regulation.

liability issue; consequently, the regulation is invalid. Brief of Appellant/Cross–Appellee at 16–20 (citing *Saint James Hosp. v. Heckler*, 760 F.2d 1460 (7th Cir.), *cert. denied*, 474 U.S. 902, 106 S.Ct. 229, 88 L.Ed.2d 228 (1985)). By this charge, New Mexico suggests that FNS ignored public comments on the issue of postal service theft and negligence, opting to issue the regulation as proposed and delay study of the problem until later.

New Mexico's contention overlooks the fact that FNS had studied mail issuance loss data for a three-year period before issuing the proposed rule. The final rule represented the agency's decision to reject, at least for the time being, the suggestion that states be relieved of liability for losses due to post office negligence or theft, but its willingness and intention to study the problem further. There is no evidence that FNS failed adequately to consider comments on this problem or that its data or its reasoning based on that data was flawed (as was the case in *Saint James Hosp. v. Heckler*). Nor is this case like *Hooker Chemicals & Plastics Corp. v. Train*, 537 F.2d 620, 633 (2d Cir.1976), where the EPA had conceded that the regulations it was promulgating failed to account for certain significant factors and merely promised that it would later amend them to correct this deficiency. In contrast, the agency here, based on the studies it had done, simply declined to adopt suggestions for a fault-based system. New Mexico cites to no evidence in the rulemaking record that suggests this decision was irrational or unreasonable. In essence, New Mexico is simply arguing that FNS should have done more than it did and that this court should substitute its judgment for the agency's. That we may not do. *See American Mining Congress v. Marshall*, 671 F.2d 1251, 1260 (10th Cir.1982) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)).

■ Additionally, as FNS notes, even if its decision to study further the possibility of adopting a fault-based system was error, it was harmless error. Interim rules in force at the time FNS was considering comments on its proposed mail loss rule (rules that were required by the Omnibus Budget Reconciliation Act of 1982) also did not distinguish between losses caused by the Postal Service and those resulting from other causes. The interim rules were to remain in effect until FNS adopted final rules. Even after conducting the further study promised in the preamble to its final rule, FNS continues to believe that no changes are needed with regard to the possibility of theft by Postal Service employees. *See* 51 Fed.Reg. 12,268, 12,275 (1986). Thus, no harm has accrued to New Mexico as the result of FNS's decision to issue the rule it did, pending further study of the problem.

■ Finally, New Mexico recites other relevant factors that it claims FNS improperly failed to consider in formulating the mail loss regulation. These arguments too must fail for two reasons. First, as we've already stated, FNS's rulemaking decision must be reviewed on the basis of the record before the agency at the time the rule was promulgated. *See American Mining Congress v. Thomas*, 772 F.2d 617, 626 (10th Cir.1985). It is apparent that the factors New Mexico alleges FNS overlooked are derived from deposition testimony and other information obtained during the trial-related discovery process. These arguments cannot properly form the basis for review of the agency's rulemaking decision. *United States v. Morgan*, 313 U.S. 409, 422, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941). Second, New Mexico suggests that the regulation is invalid because the agency did not properly consider its cost effectiveness. This argument is without foundation. There is no requirement that FNS's regulations be based on a cost-benefit analysis. Moreover, the cost comparison sought by the State would have been extremely expensive to undertake. In any event, FNS did address cost effectiveness in the preamble to the final rule, and the rule itself presupposes that the states will analyze costs and benefits and make their own decisions regarding the most effective food stamp distribution systems. 48 Fed.Reg. at 15,225.

We hold that FNS satisfied the notice and comment requirements of the Administrative Procedure Act, 5 U.S.C. § 553, including considering relevant matter presented to it and providing a "concise general statement of [the rule's] basis and purpose." 5 U.S.C. § 553(c). The rule must be sustained if it is supported by substantial evidence when considered on the record as a whole; substantial evidence means "more than a mere scintilla." *Katzson Bros. v. United States Envtl. Protection Agency*, 839 F.2d 1396, 1399 (10th Cir.1988). This standard of review requires us to give due deference to an agency's special expertise and discretionary power to fashion remedies. *See id.* We find substantial evidence to support FNS's decision. The mere possibility that a different conclusion could have been sustained does not empower this court to overturn that decision. We may neither weigh the evidence nor substitute our discretion for that of the agency. *Jozefowicz v. Heckler*, 811 F.2d 1352, 1357 (10th Cir. 1987). We accordingly find the FNS mail loss regulation was properly promulgated

and the rule itself is not arbitrary or capricious.

### III. Federal Government's Power to Collect Prejudgment Interest on New Mexico's Debt

■ The district court held that FNS could not charge New Mexico interest on overdue amounts due FNS under the mail loss issuance regulation. New Mexico contends that the Debt Collection Act of 1982, 31 U.S.C. §§ 3701(c), 3717,[4] abrogated the federal government's common-law right to charge interest on unpaid debts owed by state or local governments. Section 3717 of the Act requires that the federal government charge a minimum rate of annual interest on outstanding debts owed by "persons" to the United States Government and prescribes a penalty for failure to pay any debt that is more than ninety days past due. Section 3701 of the Act excludes from the definition of "person" for purposes of § 3717 any agency of a state government or unit of general local government. Four circuit courts have considered this issue and three have decided that as a

**4.** 31 U.S.C. § 3717 (1982) provides:

(a)(1) The head of an executive or legislative agency shall charge a minimum annual rate of interest on an outstanding debt on a United States Government claim owed by a person that is equal to the average investment rate for the Treasury tax and loan accounts for the 12–month period ending on September 30 of each year. . . .

(2) The Secretary may change the rate of interest for a calendar quarter if the average investment rate for the 12–month period ending at the close of the prior calendar quarter . . . is more or less than the existing published rate by 2 percentage points.

(b) The interest under subsection (a) of this section accrues from [one of two prescribed dates].

. . . .

(c) The rate of interest charged under subsection (a) of this section—

(1) is the rate in effect on the date from which interest begins to accrue under subsection (b) of this section; and

(2) remains fixed at that rate for the duration of the indebtedness.

(d) Interest under subsection (a) of this section may not be charged if [certain conditions are met].

(e) The head of an executive or legislative agency shall assess on a claim owed by a person—

(1) a charge to cover the cost of processing and handling a delinquent claim; and

(2) a penalty charge of not more than 6 percent a year for failure to pay a part of a debt more than 90 days past due.

(f) Interest under subsection (a) of this section does not accrue on a charge assessed under subsection (e) of this section.

(g) This section does not apply—

(1) if a statute, regulation required by statute, loan agreement, or contract prohibits charging interest or assessing charges or explicitly fixes the interest or charges; and

(2) to a claim under a contract executed before October 25, 1982, that is in effect on October 25, 1982.

(h) In conformity with standards prescribed jointly by the Attorney General and the Comptroller General, the head of an executive or legislative agency may prescribe regulations identifying circumstances appropriate to waiving collection of interest and charges under subsections (a) and (e) of this section. . . .

31 U.S.C. § 3701(c) provides: "In sections 3716 and 3717 of this title, 'persons' does not include an agency of the United States Government, of a State government, or of a unit of a general local government."

result of the Debt Collection Act the federal government may no longer charge interest on debts owed it by the states, absent specific statutory authorization. *Arkansas v. Block,* 825 F.2d 1254 (8th Cir.1987); *Pennsylvania, Dep't of Public Welfare v. United States,* 781 F.2d 334 (3d Cir.1986); *Perales v. United States,* 598 F.Supp. 19 (S.D.N.Y.), *aff'd,* 751 F.2d 95 (2d Cir.1984) (per curiam). Only the Sixth Circuit has rejected the claim that the Debt Collection Act precludes the federal government from charging the states interest on their unpaid debts. *County of St. Clair v. United States Dep't of Labor,* 754 F.2d 375 (6th Cir.1984).[5]

New Mexico contends that the Debt Collection Act clearly was not intended to be applied to the states. Because the statute is not silent or ambiguous, it argues, there is no need for interpretation by either the agency (FNS) or the court. "If the intent of Congress is clear, that is the end of the matter; for the Court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). FNS counters that the Act is completely silent as to the rights and liabilities of state and local governments with respect to overdue debts owed to the United States. FNS reasons that §§ 3701 and 3717 do not *prohibit* the federal government from charging states interest, but rather impose certain requirements concerning interest rates to be charged, methods for computing those rates, and other penalties applicable to persons other than state and local government entities. The Act does not abrogate the federal common-law right to charge state and local governments interest, it merely maintains the status quo between the federal government and those entities. In other words, FNS argues, the Act leaves intact the federal common-law

right to obtain compensation to make the federal government whole when the United States is injured by the failure of a state to pay its debt. The Act simply excepts state and local governments from the mandatory provisions of § 3717.

FNS concedes that its perspective of the Debt Collection Act has been rejected by three circuit courts of appeals. But it argues that, given that the statute is silent as to its effect on the federal common-law right to charge interest, this court should give appropriate weight to the agency's interpretation of the statute. FNS argues that, under *Chevron,* if "the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute.... Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782. FNS provides us with three reasons to depart from the course taken by the Second, Third, and Eighth Circuits: first, a recent Supreme Court opinion postdating those circuit courts' decisions that clarifies the federal common-law right to collect interest on unpaid debts; second, the legislative history of the Debt Collection Act; and third, the overall purpose of the Debt Collection Act.

In *West Virginia v. United States,* 479 U.S. 305, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987), the United States Supreme Court held:

"[t]he rule governing the interest recovered as damages for delayed payment of a contractual obligation to the United States is not controlled by state statute or local common law. In the absence of an applicable federal statute, it is for the federal courts to determine, according to their own criteria, the appropriate mea-

---

5. The parties dispute the precedential value of the unpublished *St. Clair* opinion. However, it can have precedential value in the Sixth Circuit under that circuit's rule 24, and we are not precluded by our rules from considering it. Because the *St. Clair* court summarily rejected the claim that the Debt Collection Act had abrogat-

ed the common law, we do not have the benefit of its reasoning. However, as FNS points out, the bare fact that the Sixth Circuit reached a different conclusion than did the circuits that previously considered the question demonstrates that the Debt Collection Act *is* ambiguous.

sure of damage, expressed in terms of interest, for nonpayment of the amount found to be due."

*Id.* at 308–09, 107 S.Ct. at 705 (quoting *Royal Indem. Co. v. United States,* 313 U.S. 289, 296, 61 S.Ct. 995, 997, 85 L.Ed. 1361 (1941)). The Court observed that it was a "longstanding rule that parties owing debts to the Federal Government must pay prejudgment interest where the underlying claim is a contractual obligation to pay money." 479 U.S. at 310, 107 S.Ct. at 706. "Prejudgment interest," the Court held, "is an element of complete compensation." *Id.* The *West Virginia* Court noted that the Debt Collection Act of 1982 was inapplicable to the case at bar because the claim at issue arose under a contract entered into before October 25, 1982, and thus under the terms of § 3717(g)(2) the Act did not apply. The Court stated:

> We can draw no inference about Congress' comprehension of the federal common law of interest from its enactment, without any discernible legislative history, of a definitional section excluding state agencies from those "persons" statutorily required to pay interest on debts owed to the Federal Government. Moreover, we venture no opinion regarding the question whether this enactment was intended to abrogate or leave intact the federal common law governing when a State must pay interest to the Federal Government.

479 U.S. at 312 n. 6, 107 S.Ct. at 707 n. 6.

The sole issue in *West Virginia* was whether the state was liable for prejudgment interest on a debt arising from a contractual obligation to reimburse the United States for services rendered by the Army Corps of Engineers. *See* 479 U.S. at 306, 107 S.Ct. at 704. While conceding that too much weight ought not be placed upon the inference, FNS astutely observes that it is unlikely that the Supreme Court in 1986 would grant *certiorari* to consider an issue that, under 31 U.S.C. § 3717(g)(2), would have been prospectively mooted for all contracts entered into after October 25, 1982. *See* Brief of Appellee at 41 n. 33. We note also that, while the Supreme

Court expressly reserved the issue, its reference (quoted above) to the relationship between the Debt Collection Act and the federal common law right to collect interest at least suggests that the statute is not as unambiguous as appellant would have us find.

*West Virginia* predated the Second Circuit's opinion in *Perales* and the Third Circuit's decision in *Pennsylvania, Dep't of Public Welfare.* The Eighth Circuit in *Arkansas v. Block,* decided the same year as *West Virginia,* merely noted that *West Virginia* was distinguishable because the contract at issue in *Arkansas* was entered into *after* October 25, 1982. The Eighth Circuit did not respond to the common-law abrogation issue left open by the Supreme Court in *West Virginia. See* 825 F.2d at 1258 n. 7. This recent, unqualified reaffirmation by the Supreme Court of a federal common-law right to prejudgment interest on the overdue debts of state and local governments prevents us from readily accepting the claim that the Debt Collection Act abrogates that "long-standing rule." We turn to appellee's second and third arguments for additional guidance in resolving this issue.

As the Supreme Court noted, there is no "discernible legislative history" concerning the definition of "person" in the Debt Collection Act of 1982. 479 U.S. at 312 n. 6, 107 S.Ct. at 707 n. 6. The new definition of "person" first appeared as part of an extensively revised version of the bill introduced on the Senate floor and substituted for the committee-reported bill. The amendment was never explained, discussed, or debated. Thus there is no evidence of Congress's intent in excepting state and local government agencies from the mandatory requirements of §§ 3716 and 3717. Where neither the plain language of the statute nor its legislative history sheds any light on the question, we look to the purpose of the Act itself for guidance. "A statute must be interpreted to effect its evident purpose, and to be consistent with 'evidenced congressional intent.'" *Rocky Mountain Oil & Gas Ass'n v. Watt,* 696 F.2d 734, 745 (10th Cir.1982) (citations omitted).

FNS argues that the Debt Collection Act was passed because Congress was concerned about the frequent failure of debtors to honor their obligations; the Act was intended to tighten the collection process. FNS notes that nowhere in the legislative history was it suggested that any debtor's burden should be alleviated. The Senate Report, for example, expressed distress over "the increasing backlog of unpaid debts owed to the Government," and explained that, "[i]n the absence of interest charges for delinquent payments, debtors have little or no incentive to make timely payments. Also, debtors are likely to pay their private sector debts first and their government debts last." Report of the Senate Committee on Governmental Affairs on S. 1249, S.Rep. No. 378, 97th Cong., 2d Sess. 17 (1982), U.S.Code Cong. & Admin.News 1982, pp. 3377, 3393. While Congress may not have believed it necessary to require that the strong prodebt collection measures mandated in § 3717 also be imposed against states, it is highly unlikely that Congress intended to create incentives for nonpayment of the states' debts and thereby exacerbate the very problem it was attempting to cure by the Act. A statute should not be construed to produce such an absurd result. *See International Minerals & Chem. Corp. v. Llano, Inc.*, 770 F.2d 879, 886 (10th Cir.1985), *cert. denied*, 475 U.S. 1015, 106 S.Ct. 1196, 89 L.Ed.2d 310 (1986).

In support of this conclusion, we cite the principle that implied repeals of the common law are disfavored and should be found only where such a statutory purpose is evident. *St. Regis Paper Co. v. United States*, 368 U.S. 208, 218, 82 S.Ct. 289, 295, 7 L.Ed.2d 240 (1961); *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783, 72 S.Ct. 1011, 1014, 96 L.Ed. 1294 (1952). The Third Circuit refuted this argument on the ground that "[j]udicial deference to the common law, and the reluctance to declare its demise, is based on the federal judicial obli-

gation to protect *state* sovereignty and laws absent clear declarations by Congress." *Pennsylvania, Dep't of Public Welfare*, 781 F.2d at 342 (emphasis added). In other words, according to the Third Circuit, such judicial deference is required only with respect to state, not federal, common law. The Third Circuit's reliance on *City of Milwaukee v. Illinois*, 451 U.S. 304, 312–14, 101 S.Ct. 1784, 1789–91, 68 L.Ed.2d 114 (1981), in support of this conclusion, however, is misplaced. *Milwaukee* involved a comprehensive statutory program, the Federal Water Pollution Control Act Amendments (FWPCA) of 1972, and a remedy fashioned by the trial court under the federal common law of nuisance. Whether there is a distinction between the proper judicial deference to federal and state common law was not an issue in the case. Rather, the question resolved by the Court was whether the comprehensive nature of the FWPCA had supplanted federal common law in that area. The Court stated that federal common law applies " '[u]ntil the field has been made the subject of comprehensive legislation or authorized administrative standards.' " 451 U.S. at 314, 101 S.Ct. at 1791. It held that Congress had not left the formulation of appropriate federal water pollution standards to the courts through application of nuisance concepts, but had occupied the field through the establishment of a *comprehensive* regulatory program under the Amendments. *See id.* at 317, 101 S.Ct. at 1792. The Court reportedly emphasized the unusually comprehensive nature of the FWPCA.

*Milwaukee* and this case are easily distinguished; the Debt Collection Act of 1982 cannot be seen as the " 'total restructuring' and 'complete rewriting' " of existing debt collection law as were the FWPCA with respect to water pollution law.[6] *See* 451 U.S. at 317, 101 S.Ct. at 1792. As the Supreme Court noted in *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625, 98 S.Ct. 2010, 2015, 56 L.Ed.2d 581 (1978), "[t]here

---

6. The "detailed explanation prepared by the office of Law Revision Counsel" for P.L. 97–452, the Debt Collection Act of 1982, stated that the "purpose of the bill [was] to codify without substantive change recent laws related to money and finance and to improve the United States Code.... Like other codifications ... this bill makes no substantive change in the law." 1982 U.S.Code Cong. & Admin.News 4301, 4301–02.

is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted." "[W]hen [an Act] does speak directly to a question, the courts are not free to 'supplement' Congress' answer so thoroughly that the Act becomes meaningless." *Id. See also City of Milwaukee v. Illinois,* 451 U.S. at 315, 101 S.Ct. at 1791. Allowing interest to be collected from states whose debts to the federal government are overdue is an example of "filling a gap left by Congress' silence" in the Debt Collection Act of 1982.

In further support of this conclusion, FNS cites the construction given the statute by the General Accounting Office and the Comptroller General shortly after its enactment. As the Comptroller General noted: "There is no evidence of congressional intent to prohibit ... the assessment of interest and other charges against State and local governments when an agency of the Federal Government is acting pursuant to some other authority which may be available to it, whether founded in statute or common law." Decision of the Comptroller General (Aug. 23, 1983) at 2. The Comptroller General further noted § 3717(g)(1) contains a proviso that it will not apply if another statute explicitly provides for interest or prohibits the assessment of interest and other charges authorized by § 3717. He reasoned that this proviso demonstrates Congress did not intend by passage of § 3717 to repeal by implication any preexisting statutes that authorize or govern the assessment of interest and other charges. *See id.* at 3; *see also Morton v. Mancari,* 417 U.S. 535, 550, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974).

The Comptroller General and the GAO presumed as we do that, had Congress intended to establish a comprehensive program that repealed or abrogated common law principles, it would have provided statutory language to that effect or at least legislative history to support such a construction. As the Supreme Court stated in *Isbrandtsen,* 343 U.S. at 783, 72 S.Ct. at 1014: "Statutes which invade the common law ... are to be read with a presumption favoring the retention of long-established

and familiar principles, except when a statutory purpose to the contrary is evident." The silence on this issue in the legislative history is significant; "such reticence while contemplating an important and controversial change in existing law is unlikely.... At the very least, one would expect some hint of a purpose to work such a change, but there was none." *Edmonds v. Compagnie Generale Transatlantique,* 443 U.S. 256, 266–67, 99 S.Ct. 2753, 2759–60, 61 L.Ed.2d 521 (1979).

A final argument raised by the court in *Perales,* 598 F.Supp. 19, and relied on by New Mexico, is that assessing interest on claims owed by the states under the mail loss regulation improperly extends the terms and conditions under which those states have agreed to participate in the food stamp program, in contravention of the principle established in *Pennhurst State School & Hosp. v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). *Pennhurst* held:

> [L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract." There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.

*Pennhurst,* 451 U.S. at 17, 101 S.Ct. at 1540 (quoted in *Perales,* 598 F.Supp. at 24). The District Court for the Southern District of New York held that, under *Pennhurst* and absent an unambiguous authorization by Congress in the Food Stamp Act, "FNS' policy of assessing late payment interest against state agencies must be deemed invalid." 598 F.Supp. at 24.

The limits of the *Pennhurst* doctrine were described in *Bell v. New Jersey,* 461 U.S. 773, 103 S.Ct. 2187, 76 L.Ed.2d 312 (1983). The *Bell* Court distinguished

**800**

*Pennhurst,* explaining: *"Pennhurst* arose in the context of imposing an unexpected condition for compliance—a new obligation for participating States—while here our concern is with the remedies available against a noncomplying State." 461 U.S. at 790 n. 17, 103 S.Ct. at 2197 n. 17. The same distinction applies here. FNS is not seeking to force New Mexico to comply with an obligation not set out in the Food Stamp Act or program regulations, but rather is seeking interest as a remedy for the state's breach of a known and voluntarily undertaken obligation—the duty to pay for excess losses of food stamps distributed through the mail. The state has failed to reimburse FNS promptly for those losses and thus is in default of its statutory obligation.

The lack of an express provision in the Food Stamp Act authorizing the assessment of interest against a state in default does not preclude the federal agency from assessing interest, nor does it make interest an unknown or unexpected condition of the state's contract with the federal agency. As the Supreme Court stated in *West Virginia,* "interest is an element of complete compensation." 479 U.S. at 310, 107 S.Ct. at 706. "This federal interest in complete compensation is likely to be present in any ordinary commercial contractual arrangement between a State and the Federal Government." *Id.* at 311, 107 S.Ct. at 706. Commercial contracts between private persons also frequently do not have express provisions providing for interest upon a debt not promptly paid, yet interest is commonly awarded to the nonbreaching party. The purpose of interest is not to punish a debtor by imposing a new condition but to make the injured creditor whole for the lost use of the money. The Ninth Circuit recently adopted this reasoning in *Riles v. Bennett,* 831 F.2d 875, 877–88 (9th Cir.1987), *cert. denied,* 485 U.S. 988, 108 S.Ct. 1291, 99 L.Ed.2d 501 (1988), in holding that the *Pennhurst* doctrine did not stand as a bar to prejudgment interest in a dispute over Education Department grant funds allegedly misspent.

Accordingly, we hold that the Debt Collection Act of 1982 did not abrogate FNS's federal common-law right to assess interest on outstanding debts of the states incurred pursuant to the Food Stamp Act and specifically FNS's mail loss regulation. The district court is REVERSED on this point and the case is REMANDED for entry of judgment in accordance with this opinion.